[No. 36838.   Department Two.   January 16, 1964.]

C. H. RITTER, *Respondent,* v. J. G. SHOTWELL *et al.,*
*Appellants.** 

*Reported in 388 P. (2d) 527.

*Allen, DeGarmo & Leedy,* for appellants.

*Hullin, Ehrlichman, Carroll & Roberts,* for respondent.

DAWSON, J.[†]—C. H. Ritter, an agent of the United Pacific Insurance Company, brought this action to recover the unpaid balance of a premium, the consideration for a performance bond issued by his principal. The bond was written to insure performance of a contract awarded to J. G. Shotwell, a defendant, by the Bureau of Reclamation, Department of the Interior of the United States, for supplying pozzolan at the site of the Glen Canyon Dam and Power Plant, Glen Canyon Unit, Arizona-Utah Middle River Division, Colorado River Storage Project, at an agreed price.[1] The performance bond was in the amount of $1,254,000. Mr. Ritter was granted judgment against J. G. Shotwell and Alice Shotwell, a marital community, and J. G. Shotwell, Inc., an indemnitor, in the amount of the prayer. They appeal.

Was a valid rate applied in computing the premium? Succinctly stated, this is the sole issue. Certain assignments of error touching the admission of evidence and findings, which we consider immaterial need not be considered by us in our disposition.

Pozzolan is a product primarily manufactured from volcanic ash.[2] It is said that, in some of its properties, it is superior to Portland cement. Because pozzolan has but recently been put to use, the problems of supply were not known to the underwriters. It became necessary to secure detailed underwriting facts before the rate could be de-

---

[†]Judge Dawson is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2 (a) (amendment 38), state constitution.

[1]No conflict of law problem has arisen.

[2]The invitation for bids listed results of tests made of undeveloped deposits in the area of material suitable for the manufacture of pozzolan. It outlined necessary manufacturing process. It set out necessary properties of pozzolan as to fineness, compressive strength, reactivity, and chemical composition. Methods of inspections and tests comprised eight single-spaced pages of material.

termined. Mr. Shotwell advised the insurer that he had acquired approved deposits of the volcanic ash in sufficient amount in the vicinity of the project, that he intended to install a crushing and drying plant, dig and manufacture pozzolan, provide necessary precautions in storage for the finished product, and then deliver to the site, in compliance with the supply contract.

Pozzolan was not classified in United Pacific's rate manual filed and in force at the time in question. In its rate manual index, approximately 400 subjects are listed in the contract section under five general classifications. The underwriter applied the rate provided in the classification of class A contracts.[3]

Appellants maintain that the rate listed under the classification of supply contracts, which is substantially lower than the class A rate, was applicable, because the bond risk arose from a supply contract. Respondent maintains that the rate manual is an adaptation by United Pacific of a determination by the Surety Association of America from statistical and other information; that there is no pretext of detailing each factual application where the risks are not known and there is no cost experience available. In such cases, it is argued, the rate must be determined by expert comparison and analysis.

Our code does not attempt to fix the rates covering surety insurance. A performance bond is presently defined as "surety insurance." RCW 48.11.080. "Premium rates for insurance shall not be excessive, inadequate, or unfairly discriminatory. . . ." RCW 48.19.020. Uniformity of rates among insurers is not required. RCW 48.19.030(5). Rates shall be filed, and all modifications, and shall be followed in computing premiums. RCW 48.19.040.

■ Page C-13 of the manual applies to supply contracts. Fifty-one articles subject to the supply rate are listed. (Obviously, the list is not intended to be exclusive of other risks.) Pozzolan is not named, and only two items are even

---

[3] Class A contracts are described on page C-7 of the manual as ". . . contracts for furnishing and installing, or installing only, certain services or equipment . . . ."

remotely related to it. One is "Concrete or Cement (mixed) furnishing and delivering." The other item is "Stone, crushed." It is common knowledge that both are available on the open market and the risks of supply are well known. Neither material is comparable, for the court found that pozzolan cannot be readily obtained on the market; it must be supplied by the method of digging, manufacturing, and then storing and delivering under certain rigid precautions.

It is true that fly ash, which is neither dug nor manufactured, has somewhat similar properties. However, it is darker in color, and it was not found that fly ash would have been acceptable or available on the market in sufficient quantities to fill the supply contract requirements. Thus, it would be unrealistic to close one's eyes to the obvious increased risk involved in writing a surety bond for the supplying of pozzolan under the circumstances. It would seem arbitrary to apply the supply contract rate, regardless of risk, and regardless of the fact that pozzolan was not classified. Such a premise is not within the statutory contemplation, for RCW 48.19.030(2)(b) provides:

" . . . Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses."

It shall also take into account RCW 48.19.030(3)(a), past and prospective loss experience; RCW 48.19.030(3)(c), a reasonable margin for underwriting profit and contingencies; RCW 48.19.030(3)(e), all other relevant factors.

The record does not disclose how the variation in risk was actually measured. Suffice it to observe that there was no pretension that the premium was excessive, in view of the risk purchased, or discriminatory. The court approved the rate by drawing an analogy from a section in the rate manual covering supply contracts. The item "Stone, crushed" is subject to a qualification, which we paraphrase: When the materials to be supplied for a specific job must be procured from a quarry, sand or gravel pit alongside the

project, the higher class A rate shall apply. We presume, with fallible tests at best, the risk is deemed increased by limiting the source of supply to a specific pit. We agree with appellants that this proviso does not encompass pozzolan, even though, by comparison, it is obvious there are more unknown factors affecting the risk assumed in the instant case than is the case of the roadside pit for, after all, "Stone, crushed" is available in the market.

We feel no compulsion to fit the cost of the risk into the rate manual by constrictive or other process. Simply stated, there was a void in the manual. The supplying of pozzolan was never contemplated, and the insurer was not required to accept a risk for an inadequate compensation.

In *United States Fidelity & Guar. Co. v. Anderson Constr. Co.*, 260 F. (2d) 172, after pointing out that numerous sections of the Washington code do not apply to surety insurance (RCW 48.18.140, 48.18.180, 48.18.080, 48.30.170, 48.18.190), it is stated that the "rate filing" sections (RCW 48.19.040, 48.19.050, and 48.19.280) applicable to surety insurance, ". . . are really administrative penalties to enforce a specified line of conduct among the regulated companies. . . ." After pointing out the peculiar characteristics of the applicable statutes, the court then concluded that a departure from the manual rate was enforceable. The court said (p. 177):

"The clauses which relate to companies writing surety insurance contracts and which relate to such contracts apparently are inept to avoid the oral contract. . . ."

(Cites *Way v. Pacific Lbr. & Tbr. Co.*, 74 Wash. 332, 133 Pac. 595.)

It is difficult to criticize these case results, assuming that the premiums were not "excessive, inadequate, or unfairly discriminatory." The true measuring stick is aptly stated in Richards, Law of Insurance (5th ed.) p. 220, note 16:

". . . the rates charged by insurance companies should be reasonable, adequate, and fair. They should be reasonable —so that the insured is not overcharged; adequate—so that the insurer is financially able to furnish sound insurance and to meet its obligations; and fair—so that the rates do not . . . treat equals unequally. . . ."

The trial court found that appellants had agreed to pay the premium as computed. Negotiations had extended over several months, including the issuance and payment of premium for a bid bond. Fully informed and advised discussions included the probable classification of the risk. Mr. Shotwell did not categorically deny that he had been informed of the rate which was to be applied before he made application for the performance bond. These circumstances were in a periphery which placed the trial court in an advantageous position to weigh and evaluate evidence. We do not question the finding.

Other avenues were open to appellants. If time had not been of the essence, there could have been an insistence that the rate manual be supplemented, or appellants, on a competitive basis, could have gone elsewhere. The alternative resorted to by the parties was a meeting of the minds as to risk, coverage, and a rate not shown to be offensive to the statutory test against excessiveness, inadequacy, or discrimination. This propels the matter of rates into the field of private contract.

Sans regulatory features, the general rule is well stated in *Isaacson Iron Works v. Ocean Acc. & Guarantee Corp.*, 191 Wash. 221, 229, 70 P. (2d) 1026:

" . . . In any event, unless it appears from the evidence that the premium paid is grossly out of line in consideration of the coverage, the cost of the insurance is a matter for the parties to determine. . . ."

■ It is obvious that the private contract violated regulations of the insurance code. However, we have found no provision in the code which would nullify their act. Indeed, such provision would seem burdensome in the field of surety insurance, unless underwriting can keep abreast of scientific uses and techniques as applied by modern technology. It would seem that the established rule should be applied that " . . . a contract which violates a statutory regulation of business is not void unless made so by the terms of the act." *Way v. Pacific Lbr. & Tbr. Co.*, 74 Wash. 332, 133 Pac. 595; *Lane v. Henry*, 80 Wash. 172, 141 Pac. 365; *Yakima Lodge No. 53, Knights of Pythias v. Schneider*, 173

Wash. 639, 24 P. (2d) 103; *Fleetham v. Schneekloth,* 52 Wn. (2d) 176, 324 P. (2d) 429.

For the reasons announced, we have concluded that the rights of the parties are to be measured by their own agreement. The judgment is therefore affirmed.

OTT, C. J., DONWORTH, FINLEY, and WEAVER, JJ., concur.

\*Reported in 388 P. (2d) 552.